**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

TRACY WOODSON MARTIN,
Plaintiff-Appellant,

v.

ORTHODONTIC CENTER OF
CHARLESTON,
Defendant-Appellee,

                                          No. 99-1414

and

ORTHODONTIC CENTERS OF SOUTH
CAROLINA, INCORPORATED, a/k/a
Orthodontic Center, a/k/a
Orthodontic Centers of America,
Incorporated,
Defendant.

Appeal from the United States District Court
for the District of South Carolina, at Charleston.
Patrick Michael Duffy, District Judge.
(CA-97-2931-2-23-AJ)

Argued: March 1, 2000

Decided: March 24, 2000

Before WILKINS, NIEMEYER, and KING, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Calvin Allison Rouse, Augusta, Georgia, for Appellant. Allan Riley Holmes, GIBBS & HOLMES, Charleston, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Tracy Woodson Martin appeals an order of the district court granting summary judgment to Orthodontic Centers of South Carolina, Incorporated and Orthodontic Center of Charleston (collectively, "Appellees") on Martin's claim of racial discrimination, see 42 U.S.C.A. § 2000e-2(a)(1) (West 1994). Finding no error, we affirm.

I.

The facts, viewed in the light most favorable to Martin, are as follows. In September 1994, Dr. Bradley Nirenblatt hired Martin as a part-time technical assistant for the Orthodontic Center of Charleston ("OCC"), an affiliate of Orthodontic Centers of South Carolina ("OCSC"). Shortly after hiring her, Dr. Nirenblatt sent Martin to Florida for a two-week training course offered by OCSC, during which Martin learned the skills necessary to provide certain orthodontic services. She also received training on "front desk" duties such as taking in new patients and filing insurance claims.

In January 1995, OCC's office manager was terminated. At that time, Martin assumed primary responsibility for managing the office until a replacement could be found. As of February 1, Martin was given full-time status and benefits. In February, Dr. Nirenblatt hired Randi Clement as office manager. Martin never applied, and Dr.

2

Nirenblatt never considered her, for the position. Although Clement had never worked in an orthodontic office before, she possessed eight years' experience managing a large pet store. When Clement was hired, Martin was informed that she would be "co manager" with Clement; however, no such title was ever formally conferred upon Martin. Martin trained Clement in office procedures. As Clement gradually became proficient in her duties, Martin's responsibilities were reduced; eventually, Martin was returned to part-time, technical assistant work.

In July 1995, while Martin was on vacation, two coworkers telephoned and informed her that racial slurs had been used in the office. According to the coworkers, one employee had made a comment about coming to the office in a white sheet, and others had called Martin a "black bitch" and referred to her using a racial epithet. J.A. 69. None of these comments were made in Martin's presence. Martin complained about the comments to Dr. Nirenblatt a few weeks after she returned from vacation. Although Dr. Nirenblatt took no action, the record contains no evidence of any further racist comments.*

Martin received three raises during her 11 months of employment, all of which were approved by Dr. Nirenblatt, and there is no dispute that she was proficient in her employment duties. However, Martin did receive several disciplinary reports during her employment. In June 1995, an altercation occurred between Martin and a coworker in the presence of a patient and a prospective employee, after which Martin left the office for an hour. Dr. Nirenblatt wrote a disciplinary report, on which Martin added a notation agreeing that her attitude must improve within two weeks or she would be terminated. Martin's attitude improved and she was not terminated. In November, Martin assisted another employee who was having difficulty with some work on a patient. The patient was very upset and left the office in tears, prompting an inquiry by Dr. Nirenblatt. After speaking with Dr. Nirenblatt, Martin said to the other employee, "They are trying to drag me into that s---." J.A. 82. Dr. Nirenblatt thought the comment (which he heard as "Don't try to drag me into that s---," J.A. 110)

_____

*Martin has never raised a claim of hostile environment harassment. Rather, she contends that the racist comments support an inference that her termination was racially motivated.

3

was directed to him, and wrote Martin up for being insubordinate and unprofessional.

Approximately one week later, Martin arrived almost 30 minutes late for work. She arrived shortly after several other employees who also were late. When Dr. Nirenblatt asked Martin why she was late, she replied, "Because I was late." J.A. 110. Dr. Nirenblatt wrote a disciplinary report reprimanding Martin for being rude and reminding her that unexcused tardiness could result in termination.

On the morning of December 4, 1995, Dr. Nirenblatt wrote Martin up for being late and for failing to sign a new employee manual despite repeated requests to do so. Martin then left the office at lunchtime with a migraine headache and did not return, instead leaving a message on the answering machine that she would not be back that day. Later that evening, Martin telephoned Dr. Nirenblatt and informed him she would not be in on the fifth. Martin's mother left a message on the office answering machine at 10:00 p.m. on the sixth, stating that Martin would not be in the next day. Because Martin's mother did not contact Dr. Nirenblatt or Clement directly, as required by office sick leave policy, it was impossible to obtain a replacement for Martin and the office was left understaffed. During the afternoon of the seventh, Dr. Nirenblatt contacted Martin and informed her that she was terminated effective December 4.

After exhausting her administrative remedies, Martin filed this action alleging that her termination was due to racial animus. Following discovery, Appellees moved for summary judgment. The motion was submitted to a magistrate judge, who recommended denying the motion. On review of the magistrate judge's report, the district court granted summary judgment to Appellees, reasoning that even if Martin could establish a prima facie case of discrimination and create a material issue of fact as to whether the reasons for her termination were pretextual, she had failed to offer evidence that race was the real reason for her termination. See Vaughan v. MetraHealth Cos., 145 F.3d 197, 201-02 (4th Cir. 1998).

II.

After reviewing the parties' briefs and the applicable law, and having had the benefit of oral argument, we conclude that the district

4

court correctly granted summary judgment to Appellees. Accordingly, we affirm on the reasoning of the district court. <u>See Martin v. Orthodontic Ctrs. of S.C., Inc.</u>, No. 2:97-2931-23 (D.S.C. Mar. 4, 1999).

<u>AFFIRMED</u>

5